# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

SHELLY KIEL

                              Plaintiff,

v.                                              Civil No. 22-1319 (JRT/ECW)

MAYO CLINIC HEALTH SYSTEM
SOUTHEAST MINNESOTA,

                              Defendant

---

SHERRY IHDE,

                              Plaintiff,

v.                                              Civil No. 22-1327 (JRT/ECW)

THE MAYO CLINIC,

                              Defendant

---

ANITA MILLER,

                              Plaintiff,

v.                                              Civil No. 22-1405 (JRT/ECW)

THE MAYO CLINIC,

                              Defendant

---

KENNETH RINGHOFER,

                            Plaintiff,

v.                                              Civil No.  22-1420 (JRT/ECW)

MAYO CLINIC AMBULANCE

                    Defendant

---

KRISTIN RUBIN,

                            Plaintiff,

v.                                              Civil No.  22-1427 (JRT/ECW)

THE MAYO CLINIC

                    Defendant

---

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

---

Gregory M. Erickson and Vincent J. Fahnlander, **MOHRMAN KAARDAL & ERICKSON, P.A.,** 150 South Fifth Street, Suite 3100, Minneapolis, MN 55402, for Plaintiffs.

Emily A. McNee, George R. Wood, Hannah Camilleri Hughes, Holly M. Robbins, Katherine Tank, Kathryn Mrkonich Wilson, Lehoan T. Pham, **LITTLER MENDELSON, P.C.**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for Defendant.

Plaintiffs Shelly Kiel, Sherry Ihde, Anita Miller, Kenneth Ringhofer, and Kristin Rubin were all employed by The Mayo Clinic or its related entities, Mayo Clinic Health System Southeast Minnesota and Mayo Clinic Ambulance (collectively, "Mayo"). Mayo adopted a vaccine policy (the "Policy") that required its employees to receive the COVID-19 vaccination, receive an exemption from the vaccine requirement, or be terminated from their positions. Plaintiffs identify as Christians and allege they refused the vaccine based on their sincerely held religious beliefs. Plaintiffs Ihde and Rubin were each granted religious exemptions from the vaccine mandate but refused to comply with the Policy's requirement that they undergo consistent COVID-19 testing. Plaintiffs Kiel, Miller, and Ringhofer were all denied religious exemptions and refused vaccination. Mayo consequently terminated all five Plaintiffs. Plaintiffs then initiated this action against Mayo pursuant to Title VII, the Minnesota Human Rights Act ("MHRA"), the Americans with Disabilities Act ("ADA"), and for breach of contract and promissory estoppel.

The Court will dismiss each of Plaintiffs' Title VII claims. The Title VII claims raised by Ihde and Miller will be dismissed because they failed to administratively exhaust those claims and they are now time-barred. The Court will dismiss Rubin's Title VII claim because she failed to allege how the weekly testing requirement conflicts with her religious beliefs. Likewise, the Court will dismiss Kiel's Title VII claim because she did not adequately plead a sincerely held religious belief in opposition to Mayo's Policy. Lastly,

the Court will dismiss Ringhofer's Title VII claim because, considering the complaint as a whole, his opposition to the vaccine is a personal medical judgment, not a religious belief.

Because Plaintiffs' religious discrimination claims are based on failure to accommodate, which is not a cognizable claim under the MHRA, the Court will dismiss the MHRA claims.

As to Plaintiffs' ADA claims, the Court will dismiss the ADA claims raised by Kiel, Miller, and Ringhofer because they were not administratively exhausted and are now time-barred.  The Court will also dismiss Ihde's and Rubin's ADA claims because they failed to allege a disability, and because the weekly COVID-19 testing does not constitute an unlawful medical examination under the ADA.

As to the contractual claims, the Court will dismiss Plaintiffs' breach of contract and promissory estoppel claims because Mayo's equal opportunity policy is not sufficiently definite to constitute a contract and Plaintiffs have not sufficiently alleged reliance to their detriment.

**BACKGROUND**

I.     **FACTS**

       **A.  Mayo's Policy**

       Many of the allegations pertaining to the Policy are the same across all five Plaintiffs' complaints.  (No. 22-1319, Am. Compl. ("Kiel Compl."), Sept. 22, 2022, Docket No. 32; No. 22-1327, Am. Compl. ("Ihde Compl."), Sept. 22, 2022, Docket No. 25; No. 22-

1405, Am. Compl. ("Miller Compl."), Sept. 22, 2022, Docket No. 26; No. 22-1420, Am. Compl. ("Ringhofer Compl."), Sept. 22, 2022, Docket No. 21; No. 22-1427, Am. Compl. ("Rubin Compl."), Sept. 22, 2022, Docket No. 20 (collectively, "Am. Compls.").)  They will therefore be considered together.

When the COVID-19 pandemic began in early 2020, each Plaintiff was employed by Mayo and was asked to work additional shifts in order to cover the increased need for patient care.  (Kiel Compl. ¶ 16; Ihde Compl. ¶ 18; Miller Compl. ¶ 14; Ringhofer Compl. ¶ 10; Rubin Compl. ¶ 14.)  The COVID-19 vaccine first became available in December 2020 and Mayo initially encouraged—but did not require—its employees to become vaccinated.  (Kiel Compl. ¶ 17; Ihde Compl. ¶ 19; Miller Compl. ¶ 15; Ringhofer Compl. ¶ 11; Rubin Compl. ¶ 15.)   Mayo recognized that some of its employees would have objections to taking the vaccine and accordingly started providing religious exemptions, all or nearly all of which were granted until September 2021.  (Kiel Compl. ¶ 20; Ihde Compl. ¶ 22; Miller Compl. ¶ 18; Ringhofer Compl. ¶ 14; Rubin Compl. ¶ 18.)

In October 2021, Mayo mandated that all employees receive the COVID-19 vaccine as a condition of their continuing employment.  (Kiel Compl. ¶ 1; Ihde Compl. ¶ 2; Miller Compl. ¶ 1; Ringhofer Compl. ¶ 1; Rubin Compl. ¶ 1.)   The Policy provided that if employees did not receive the vaccine, they would be considered "noncompliant," "placed on unpaid leave," and eventually "terminated."  (Kiel Compl. ¶ 23; Ihde Compl. ¶ 24; Miller Compl. ¶ 21; Ringhofer Compl. ¶ 17; Rubin Compl. ¶ 21.)  The Policy applied to

all Mayo employees, including remote workers. (*Id.*) Mayo required that any employee whose exemption was not approved by December 3, 2021, be terminated if they had not become vaccinated. (Kiel Compl. ¶ 24; Ihde Compl. ¶ 25; Miller Compl. ¶ 22; Ringhofer Compl. ¶ 18; Rubin Compl. ¶ 22.) Mayo provided forms for its employees to apply for medical and religious exemptions but warned that only "a small number of staff are expected to qualify for a religious exemption." (Kiel Compl. ¶¶ 26–27; Ihde Compl. ¶¶ 27–28; Miller Compl. ¶¶ 24–25; Ringhofer Compl. ¶¶ 20–21; Rubin Compl. ¶¶ 24–25.) Applications were to be denied if the employee did not demonstrate a sincerely held religious belief. (Kiel Compl. ¶ 31; Ihde Compl. ¶ 32; Miller Compl. ¶ 29; Ringhofer Compl. ¶ 25; Rubin Compl. ¶ 29.)

Plaintiffs allege that Mayo was secretive about its process, intent, and reasons for denying applications. (Kiel Compl. ¶¶ 33–35; Ihde Compl. ¶ 34; Miller Compl. ¶ 31; Ringhofer Compl. ¶ 27, Rubin Compl. ¶ 41.) Plaintiffs also claim that Mayo's exemption process inconsistently granted religious exemptions. (*See* Kiel Compl. ¶ 71; Ihde Compl. ¶ 79; Miller Compl. ¶ 74; Ringhofer Compl. ¶ 72; Rubin Compl. ¶ 63.) Plaintiffs believe that the reason for the vaccine mandate was not patient safety, and that the reasons provided for Plaintiffs' termination were merely pretextual. (*Id.*)

On March 8, 2022, Mayo suspended the testing program portion of its Policy, meaning that unvaccinated employees who had been granted a religious exemption and underwent weekly testing were once again treated similarly to vaccinated employees.

(Kiel Compl. ¶ 69; Ihde Compl. ¶ 78; Miller Compl. ¶ 72; Ringhofer Compl. ¶ 70; Rubin Compl. ¶ 61.)

### B. Plaintiffs' Employment

Each Plaintiff identifies as Christian, and each asserts that it violates their sincerely held religious beliefs and conscience to receive the COVID-19 vaccine and/or undergo weekly COVID-19 testing. (Kiel Compl. ¶ 13; Ihde Compl. ¶ 14–15; Miller Compl. ¶ 11; Ringhofer Compl. ¶ 30; Rubin Compl. ¶ 11.) However, because they do not make identical claims, the Court will summarize each separately.

### 1. Kiel

Plaintiff Kiel worked for Mayo as a Licensed Practical Nurse. (Kiel Compl. ¶ 53.) Licensed Practical Nurses typically spend 25-30% of their time responding to messages from patients, which can be done remotely. (*Id.*) Mayo considered allowing many of its Licensed Practical Nurses to meet with patients remotely and to remotely respond to these messages. (*Id.* ¶ 54.) Kiel contracted COVID-19 in December 2020 and her blood tested positive for antibodies, so Kiel claims that she had natural "immunity from Covid-19." (*Id.* ¶ 55.) Kiel alleges that she cannot put "impure or dangerous" substances into her body because it is a Temple of the Holy Spirit, and that her religious beliefs prevent her from receiving the vaccine because "they were all produced with or tested with cells from aborted human babies." (*Id.* ¶ 13.)

Kiel asked Mayo for a religious exemption to the vaccine requirement, which Mayo denied. (*Id.* ¶ 52.) She was then terminated on January 3, 2022, based on her refusal to

obtain a COVID-19 vaccine.  (*Id.* ¶ 51.)  Kiel then filed a Charge with the Equal Employment Opportunity Commission ("EEOC") and the Minnesota Department of Human Rights ("MDHR"), alleging religious discrimination based on the denial of religious accommodation from the vaccine and her termination of employment.  (No. 22-1319, Decl. Emily A. McNee ("McNee Decl."), Exs. 11–12 ("Kiel Agency Filings"), Nov. 30, 2022, Docket No. 44.)  Her Charge did not assert disability discrimination, but rather only "discrimination . . . because of my religion, Christian, in violation of Title VII of the Civil Rights Act of 1964."  (*Id.* at 1.)  Kiel received a right to sue letter.  (*Id.* at 4.)

### 2. Ihde

Plaintiff Ihde worked for Mayo for 23 years, most recently as the supervisor in its Bacteriology Lab in Rochester.  (Ihde Compl. ¶ 13.)  Two assistant supervisors reported to her, and she claims that her work was primarily on a computer or over the phone.  (*Id.*)  Ihde had no direct contact with patients.  (*Id.*)  Ihde is Christian, raised Catholic, and requested religious accommodation because Elohim (God) is her healer, and "[s]hifting [her] faith from [her] Creator to medicine is the equivalent of committing idolatry-holding medicine in greater esteem than Elohim."  (*Id.* ¶¶ 15–16.)  She believes that excessive and redundant procedures, as well as intrusive testing on apparently healthy humans, are "irresponsible and cross[] the line violating [her] conscience before Elohim."  (*Id.* ¶ 16.)  Ihde also requested a medical exemption because she had a negative reaction to an influenza vaccination in 2008 that caused her to be hospitalized.  (*Id.* ¶ 37.)

Mayo approved Ihde's request for a religious accommodation. (*Id.* ¶ 36.) Under the terms of the Policy, Ihde was therefore required to undergo weekly COVID-19 testing. (*Id.* ¶ 39.) Ihde submitted an additional religious accommodation request to Mayo because her "Christian religious beliefs prevented her from undergoing the weekly testing for Covid-19." (*Id.* ¶ 41.) Ihde also discussed working remotely with her supervisor, which the supervisor approved. (*Id.* ¶ 43.) However, Mayo denied her request for an exemption from the weekly testing requirement, placed her on administrative leave, and ultimately terminated her on February 21, 2022. (*Id.* ¶¶ 44–46.) According to Ihde, Mayo also determined that it and its affiliates could never rehire Ihde, making it "virtually impossible" for Ihde to obtain employment in her field without moving from Rochester, Minnesota. (*Id.* ¶ 46.) Only one week later, Mayo suspended its requirement for unvaccinated employees to undergo weekly testing. (*Id.* ¶ 47.)

Ihde filed her first Charge with the EEOC and MDHR while she was on administrative leave, alleging religious discrimination related to the denial of an accommodation for weekly testing. (McNee Decl., Exs. 7–10 ("Ihde Agency Filings").) She never updated her first Charge after she was terminated. She filed a second Charge a few months later, alleging age and disability discrimination. (*Id.* at 8.) Ihde received a right to sue letter. (*Id.* at 10.)

### 3. Miller

Plaintiff Miller worked as a registered nurse for Mayo for over 21 years. (Miller Compl. ¶ 10.) She most recently worked on the neonatal transport team. (*Id.*) Miller

applied for a religious exemption to the vaccine requirement based on her "opposition to the use of vaccines produced with or tested by aborted baby cells," and believes that taking the vaccine "would make her complicit in the killing of the unborn babies whom the cells used in the vaccines came." (*Id.* ¶ 11.)  Her request was denied by Mayo and denied again on reconsideration. (*Id.* ¶ 10.)  Mayo consequently terminated her employment on January 3, 2022. (*Id.* ¶ 12.)

Miller filed her first Charge with the EEOC and MDHR while she was on administrative leave, alleging religious discrimination under Title VII due to Mayo's lack of accommodation. (McNee Decl., Exs. 13–17 ("Miller Agency Filings").)  She filed a second Charge a few months later, alleging age discrimination, but she never updated her first Charge after she was terminated. (*Id.* at 7.)  Miller received a right to sue letter. (*Id.* at 11.)

### 4.   Ringhofer

Plaintiff Ringhofer was employed by Mayo as a National Register Emergency Medical Technician Paramedic for 32 years. (Ringhofer Compl. ¶ 28.)  He is a current Baptist who was raised Catholic and is strongly opposed to abortion. (*Id.* ¶ 30.)  Ringhofer believes that the Policy violates his religious beliefs and conscience because the vaccines were produced with or tested with fetal cell lines and, even if they were not, he would refuse vaccination because "God's given immune system is taking care of [him]." (*Id.* ¶¶ 30, 33.)  Mayo previously granted Ringhofer a religious exemption from receiving the flu vaccine. (*Id.* ¶ 55.)  Ringhofer requested a religious exemption from the COVID vaccine

requirement and then later requested a reconsideration, which were both denied.  (*Id.* ¶ 29.)

Ringhofer filed his Charge with the EEOC and MDHR, alleging that he "sincerely hold[s] a religious belief that conflicts with [his] employer's vaccination requirement." (McNee Decl., Exs. 18–22 ("Ringhofer Agency Filings").)  He asserts he was discriminated against on the basis of his religion in violation of Title VII.  (*Id.* at 1.)  He filed a second Charge several months later, asserting that he was discriminated against based on his age. (*Id.* at 5.)  Ringhofer received a right to sue letter.  (*Id.* at 9.)

### 5.    Rubin

Plaintiff Rubin has worked for Mayo as a CT technologist for over 25 years.  (Rubin Compl. ¶ 10.)  She is Christian and "does not believe in putting unnecessary vaccines or medications in her body, or going to the doctor or allowing testing of her body when it is not necessary."  (*Id.* ¶ 11.)  It therefore violates her conscience to engage in weekly COVID testing.  (*Id.*)  Rubin detailed her religious beliefs to Mayo, and Mayo granted her religious exemption request, which was conditioned on her undergoing weekly testing for COVID-19.  (*Id.* ¶¶ 35, 37, 38.)  She requested a religious exemption to the weekly testing requirement but was denied.  (*Id.* ¶¶ 39–40.)  Rubin was placed on unpaid leave and terminated shortly thereafter.  (*Id.* ¶ 42.)

Rubin filed a Charge with the EEOC after she was terminated.  (McNee Decl., Exs. 23–26 ("Rubin Agency Filings").)  She asserted in the Charge that she was discriminated

and retaliated against based on her religion in violation of Title VII. (*Id.* at 1.) She filed a second Charge a few months later, alleging that the required COVID-19 test was just for the unvaccinated employees, which was discriminatory under the ADA because both unvaccinated and vaccinated groups can catch and transmit COVID-19. (*Id.* at 6.) Rubin received a right to sue letter. (*Id.* at 8.)

## II.    PROCEDURAL HISTORY

Each Plaintiff initiated their action against Mayo or its affiliates in May 2022. (No. 22-1319, Compl., May 16, 2022, Docket No. 1; No. 22-1327, Compl., May 17, 2022, Docket No. 1; No. 22-1405, Compl., May 24, 2022, Docket No. 1; No. 22-1420, Compl., May 25, 2022, Docket No. 1; No. 22-1427, Compl., May 26, 2022, Docket No. 1.) Mayo then moved to dismiss each case in September 2022. (No. 22-1319, 1st Mot. Dismiss, Sept. 16, 2022, Docket No. 24; No. 22-1327, 1st Mot. Dismiss, Sept. 9, 2022, Docket No. 16; No. 22-1405, 1st Mot. Dismiss, Sept. 13, 2022, Docket No. 16; No. 22-1420, 1st Mot. Dismiss, Sept. 13, 2022, Docket No. 13; No. 22-1427, 1st Mot. Dismiss, Sept. 13, 2022, Docket No. 13.)

Plaintiffs each filed amended complaints, bringing four claims against Mayo: (1) religious discrimination and failure to accommodate under Title VII of the Civil Rights Act of 1964; (2) state law religious discrimination under the MHRA, Minn. Stat. § 363A.08; (3) discrimination and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq; and (4) breach of contract and promissory estoppel. (*See generally* Am. Compls.)

Mayo has again moved to dismiss the Plaintiffs' actions.  (No. 22-1319, 2nd Mot. Dismiss, Nov. 30, 2022, Docket No. 42; No. 22-1327, 2nd Mot. Dismiss, Nov. 30, 2022, Docket No. 35; No. 22-1405, 2nd Mot. Dismiss, Nov. 30, 2022, Docket No. 36; No. 22-1420, 2nd Mot. Dismiss, Nov. 30, 2022, Docket No. 31; No. 22-1427, 2nd Mot. Dismiss, Nov. 30, 2022, Docket No. 29 (collectively, "Mots. Dismiss").)  Mayo argues that all four claims fail as to each Plaintiff, and that Plaintiffs' request for punitive damages should be denied. (*See e.g.,* No. 22-1319, Mem. Supp. Mot. Dismiss, Dec. 1, 2022, Docket No. 47.)  Plaintiffs oppose Mayo's motions.  (*See e.g.*, No. 22-1319, Mem. Opp. Mot. Dismiss, Jan. 6, 2023, Docket No. 48.)

## DISCUSSION

### I.   STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings."  *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678.  The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor.  *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.    TITLE VII CLAIMS

Mayo challenges Plaintiffs' Title VII claims on two grounds: (1) Ihde and Miller did not exhaust their administrative remedies as to the termination, and (2) all Plaintiffs failed to state a claim to relief under Title VII.

### A.  Exhaustion Requirement

Title VII requires that before a plaintiff can bring a lawsuit in court to allege unlawful discrimination, they must first file a timely charge with the EEOC or a state or local agency with authority to seek relief.  42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).  Congress has established an elaborate administrative procedure through the EEOC that is designed "to assist in the investigation of claims of . . . discrimination in the workplace and to work towards the resolution of these claims through conciliation rather than litigation."  *Patterson v. McLean Credit*

*Union*, 491 U.S. 164, 180–81 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071.  Plaintiffs must file a charge with the EEOC within one hundred and eighty days after "the alleged unlawful employment practice" occurred, or within 300 days after the alleged unlawful employment practice if they initially instituted proceedings with a state or local agency.  42 U.S.C. § 2000e-5(e)(1).

"Unlawful employment practices" are defined in other subsections of Title VII and include "numerous discrete acts."  *Morgan*, 536 U.S. at 111.  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Id.* at 114.  Administrative remedies must be exhausted as to each individual unlawful employment practice.  *See id.* at 114–15 (treating each discrete discriminatory action separately).

Here, Plaintiffs Ihde and Miller both filed charges with the EEOC before they were terminated by Mayo.  Miller's Charge stated that she "sincerely hold[s] a religious belief that conflicts with [her] employer's vaccination requirement," that her request for a religious exemption was denied, and that she was accordingly "disciplined."  (Miller Agency Filings at 1.)  Ihde's Charge similarly states that she is "unvaccinated and sincerely hold[s] a religious belief that conflicts with [her] employers [sic] COVID-19 testing requirement," and that she was placed on an unpaid leave of absence.  (Ihde Agency Filings at 1.)  Neither Ihde nor Miller supplemented or amended their EEOC Charges after they were terminated.

The Eighth Circuit has explicitly stated that termination is a "discrete act," not a continuing violation. *See Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 826 (8th Cir. 2009) (citing *Morgan*, 536 U.S. at 114) ("A termination is a discrete act, not a continuing violation."). Accordingly, Plaintiffs Ihde and Miller needed to exhaust their administrative remedies based on the alleged unlawful termination before they can bring those claims to Court. Because they did not supplement their EEOC charges to include this additional discrete act, they did not satisfy the exhaustion requirement.

Plaintiffs argue that it is irrelevant whether the EEOC charges asserted termination because they generally asserted religious discrimination. Plaintiffs rely on *Nichols v. American Nat. Ins. Co.*, 154 F.3d 875, 886–87 (8th Cir. 1998), wherein the Eighth Circuit stated that a "plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." However, this argument fails because the Eighth Circuit has modified the legal standard since *Nichols* was decided. *See Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851–52 (8th Cir. 2012). The Eighth Circuit has "considerably narrowed [its] view of what is 'like or reasonably related' to the originally filed EEOC allegations." *Wedow v. City of Kansas City*, 442 F.3d 661, 672–73 (8th Cir. 2006). Now, the Eighth Circuit strictly adheres to the statutory procedural requirements. *Richter*, 686 F.3d at 852–53. The exhaustion requirement is "equally applicable to discrete claims based on incidents occurring **after**

the filing of Plaintiffs" charge as it is to discrete claims that occurred before a charge is filed. *Id.* (quoting *Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003)).

Since termination is considered a discrete act in the Eighth Circuit, Plaintiffs Ihde and Miller needed to exhaust it in an EEOC charge. They did not. And to do so now would be untimely. 42 U.S.C. § 2000e-5(e)(1). Their claims will therefore be dismissed with prejudice.

### B.  Failure to State a Claim

The Court will assume that Plaintiffs Kiel, Ringhofer, and Rubin all exhausted their administrative remedies for their religious discrimination claims. Title VII generally makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a)(1). Only sincerely held beliefs rooted in religion are protected. *Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000). Employers need not accommodate "a purely personal preference." *Vetter v. Farmland Indus., Inc.* 120 F.3d 749, 751 (8th Cir. 1997) (citation omitted).

In determining whether a belief is religious, the Eighth Circuit considers whether the objections address "fundamental and ultimate questions having to do with deep and imponderable matters," if the teachings are "comprehensive in nature" or isolated, and if there are "certain formal and external signs" present. *Love*, 216 F.3d at 687 (quoting *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3rd Cir. 1981)). These

considerations do not constitute a rigid "test," but rather should be applied flexibly and with careful consideration to each belief system. *Id.* Though a "difficult and delicate task," courts must determine what is a "religious" belief. *Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 714 (1981). Religious beliefs do not need to be "acceptable, logical, consistent, or comprehensible to others," *id.*, and courts cannot question the "validity" of what a plaintiff believes, *United States v. Seeger*, 380 U.S. 163, 184 (1965). However, "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972).

When a plaintiff brings a Title VII religious discrimination claim based on failure to provide reasonable accommodations,[1] the Eighth Circuit employs a three-part test set forth in *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir. 2003). Plaintiffs must show (1) they have a bona fide religious belief that conflicts with an employment requirement; (2) they informed the employer of this belief; and (3) they were disciplined for failing to comply with the conflicting requirement. *Id.* (citing *Ansonia Bd. of Educ. v. Philbrook*, 479

---

[1] Plaintiffs' complaints indicate Title VII claims based on both disparate treatment and failure to accommodate. However, in their Motion to Dismiss briefing, Plaintiffs clarified they only allege that Mayo failed to accommodate their religious beliefs—not any disparate treatment. (Mem. Opp. Mot. Dismiss at 43 ("Defendants argue that Plaintiffs failed to plead facts supporting even an inference of religious discrimination. Plaintiffs' claims are for failure to accommodate their religious beliefs, not that as Christians they were treated differently than non-Christians.").) Accordingly, the Court finds any Title VII or MHRA disparate treatment claims waived and will only consider whether Plaintiffs have adequately stated a claim to relief for failure to accommodate.

U.S. 60, 65–66 (1986)).  Though Plaintiffs need not plead all three prima facie elements to survive Mayo's motions to dismiss, "[t]he elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim."  *Warmington v. Bd. of Regents of Univ. Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (citation and quotations omitted).  Once a plaintiff has alleged a prima facie failure to accommodate claim under *Jones*, the burden then switches to the defendant to show that accommodating the plaintiff's religious beliefs would result in undue hardship.  *See Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000); *see also Groff v. DeJoy*, 600 U.S. ----, No. 22-174, 2023 WL 4239256 (June 29, 2023) (requiring a burden to be "substantial in the overall context of an employer's business" for it to be considered an "undue hardship").

Here, the parties primarily dispute the first *Jones* factor: whether Plaintiffs have alleged a bona fide religious belief that conflicts with an employment requirement.  The Court will therefore consider whether Kiel, Ringhofer, and Rubin have each plausibly alleged a claim to relief under *Jones*.

### 1.  Kiel

Plaintiff Kiel believes that "her body is a Temple to the Holy Spirit and it violates her religious beliefs and conscience to take the Covid-19 vaccine."  (Kiel Compl. ¶ 13).  Kiel believes that "she must protect her body, God's Temple, and cannot put into it substances which are impure or dangerous."  (*Id.*)  She further alleges that "her religious beliefs prevent her from putting into her body the Covid-19 vaccines which are available, because they were all produced with or tested with cells from aborted human babies," so receiving

-19-

the vaccine "would make her a participant in the abortion that killed the unborn baby."

(*Id.*)  Her opposition to the COVID-19 vaccine appears twofold: (1) that she must protect

her body because it is God's Temple and (2) she opposes abortion.

As to the first belief, courts have generally been hesitant to find such broad

statements in opposition to vaccines to be a sincerely held **religious** belief.  *See*

*Petermann v. Aspirus, Inc.*, No. 22-332, 2023 WL 2662899, at *2 (W.D. Wi. Mar. 28, 2023).

The Western District of Wisconsin persuasively explained:

> [A] religious belief that the body is a temple of God is not itself
> inconsistent with receiving a vaccine. . . . Many people hold
> that belief without also believing that receiving a vaccine
> defiles the body.  The important question isn't whether an
> employee has a religious belief not to mistreat her body; the
> question is whether the employee's belief that the vaccine
> qualifies as a mistreatment is itself based in religion.  If
> [plaintiff] believed that the vaccine defiled her body because
> it was unhealthy or unsafe, that would be a medical objection,
> not a religious objection. . . . But if her objection to the vaccine
> was rooted in her belief 'that she must remain as God made
> her,' that would be sufficient to show a religious conflict at the
> pleading stage.

*Id.* (quoting *Passarella v. Aspirus, Inc.*, No. 22-287, 2023 WL 2455681, at *7 (W.D. Wis.

Mar. 10, 2023)).  Like the plaintiff in *Petermann*, Kiel believes that her body is a Temple

of the Holy Spirit.  (Kiel Compl. ¶ 13.)  She alleges it violates her beliefs to put "impure or

dangerous" substances into her body.  (*Id.*)  Because this objection appears rooted in her

belief that the vaccine is unhealthy or unsafe, which is not itself a religious belief, it does

not satisfy the first *Jones* element.

As to the second belief, Kiel alleges that receiving the COVID vaccine is against her anti-abortion beliefs.  However, Kiel does not actually tie her anti-abortion beliefs to any "formal and external signs" of religion.  *Africa*, 662 F.2d at 1032.  Kiel states that "her religious beliefs prevent her from putting into her body the Covid-19 vaccines which are available, because they were all produced with or tested with the cells from aborted human babies," and receiving the vaccine "would make her a participant in the abortion that killed the unborn baby.")  (Kiel Compl. ¶ 13.)  Federal courts have found similar statements insufficient to state a claim to relief.  *E.g., Winans v. Cox Automotive, Inc.*, No. 22-3826, 2023 WL 2975872, at *4 (Apr. 17, 2023).  Moreover, Kiel's belief that taking the vaccine makes her a complicit "participant" in abortion, even if true, has not been tied to religion.  Certainly, many Christians who oppose abortion still receive vaccines.  A religious opposition to **abortion** is different from an opposition to **vaccines** that were potentially developed using a fetal cell line.  Because Kiel fails to tie her opposition to the vaccine to any particularized religious belief, the Court will dismiss her Title VII claim.  *See Troulliet v. Gray Media Grp., Inc.*, No. 22-5256, 2023 WL 2894707, at *5 (E.D. La. Apr. 11, 2023) (concluding a plaintiff was not a member of a protected class because she failed to allege "with any particularity" that she had a bona fide religious belief that conflicted an employment requirement).

Even if Kiel alleged a sincerely held religious belief that would satisfy the first *Jones* factor, she has not alleged sufficient facts supporting the second *Jones* factor: that she

informed Mayo of her sincerely held religious belief.  Kiel claims that she "has a sincerely held religious belief, and submitted a request for an exemption."  (Kiel Compl. ¶ 36.)  After she was denied, she "submitted additional information supporting her request for exemption."  (*Id.* ¶ 46.)  Kiel does not allege exactly what she told Mayo, or even when she informed Mayo of her beliefs.  Her allegations about notifying Mayo are bare assertions that amount to no more than a formulaic recitation of the elements.  *See Iqbal*, 556 U.S. at 681.  This is inadequate to survive Mayo's motion to dismiss.

### 2.  Ringhofer

Whether Ringhofer has stated a claim to relief under Title VII for failure to accommodate is a closer call.  Ringhofer is a current Baptist "who believes, based on his interpretation of scripture that his body is a Temple to the Holy Spirit and is strongly against abortion."  (Ringhofer Compl. ¶ 30.)  He believes that the Policy violates his religious beliefs and conscience because the vaccines "were produced with or tested with fetal cell lines," and "[u]sing the fetal cells in the development of [the vaccine], knowing about it, is against my religion."  (*Id.*)  He also researched the vaccines independently and concluded "that God would take care of him."  (*Id.*)  Ringhofer alleges that God told him "to avoid the altering stuff that [the vaccines] had, that [his] God-given immune system" would help him.  (*Id.*)  At another point in his complaint, Ringhofer alleges that the vaccine is "putting in something that is unknown into my body.  God asked me not to do that."  (*Id.* ¶ 33.)  Even if the vaccine was not developed with the fetal cell line, he would not

accept the vaccine because he is "guided by God with [his] immune system." (*Id.*)  For this reason, Ringhofer has also not accepted the flu shot.  (*Id.*)  Ringhofer stated that, with respect to taking vaccines, "It's **my choice** by my guidance from my God."  (*Id.* ¶ 31 (emphasis added).)

At the motion to dismiss stage, courts must consider the complaint as a whole. *Braden*, 588 F.3d at 594.  It is inappropriate to parse the complaint "piece by piece to determine whether each allegation, in isolation, is plausible."  *Id.*  Analyzing a motion to dismiss is a context-specific task that requires the Court to "draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

Though Ringhofer has certainly alleged that he holds religious beliefs, considering the complaint as a whole, he has not alleged that his opposition to the vaccine is religious in nature.  There are many allegations in his complaint that demonstrate that his opposition to the vaccine is based on personal medical judgment.  For instance, he claims that he "did research on the vaccines" and God told him the vaccines contained "altering stuff."  (Ringhofer Compl. ¶ 30.)  He later alleges that the vaccine is "putting in something that is unknown" into his body.  (*Id.* ¶ 33.)  These statements about the safety of the vaccine highly suggest that his alleged opposition to the vaccine is a medical decision and safety judgment, not a religious belief.  *See Passarella*, 2023 WL 2455681, at *5 (dismissing a Title VII claim where the employee's opposition to the vaccine was

-23-

"predicated fundamentally on her concerns with the safety of the vaccine and her right to bodily integrity").

Moreover, Ringhofer claims that it is his "choice" whether to receive vaccines. (*Id.* ¶ 31.) That Ringhofer can choose to accept the vaccine suggests that his religion is not in direct opposition to vaccination. *See Jones*, 319 F.3d at 359 (mandating plaintiffs show that they have a bona fide religious belief "that conflicts" with an employment requirement). Because Ringhofer has failed to plausibly allege that he has a bona fide religious belief that is in opposition to Mayo's Policy, the Court will dismiss his Title VII claim.

Even if Ringhofer has satisfied the first *Jones* element, he fails to plausibly allege that he satisfies the second *Jones* element. Ringhofer pleads that he "submitted a request for an exemption" to Mayo and that he "submitted additional information supporting his request for exemption" after he was denied. (*Id.* ¶¶ 38, 48.) Like Kiel, these assertions are a bare recitation of the elements, insufficient to survive Mayo's motion to dismiss. *Iqbal*, 556 U.S. at 663.

### 3.  Rubin

Lastly, Rubin received a religious exemption from Mayo but refused to comply with Mayo's weekly resting requirement for unvaccinated employees. Rubin pleads that she "does not believe in putting unnecessary vaccines or medications into her body, or going to the doctor or allowing testing of her body when it is not necessary." (Rubin Compl. ¶

34.)  She identifies no religious tenets for this belief.  Later, she cites Genesis 1:27 for the

presumption that her body is God's temple and states that she "will honor the Lord with

[her] body by striving to cause no harm to his temple."  (*Id.* at ¶ 35.)  However, Rubin does

not explain how weekly COVID-19 testing would cause harm to her body, which suggests

that her objection to weekly testing is simply a personal medical preference.

Rubin was asked by the unemployment compensational tribunal about her beliefs

on COVID-19 testing, and she said that she prayed to God and she will follow his

instructions about whether or not to test.  (*Id.* ¶ 36.)  But again, she cites no religious

tenets for this presumption or explains how her **religion** would prohibit testing.  *See*

*Boone v. Ill. Dep't Corr.*, No. 21-3229, 2022 WL 17083394, at *5 (C.D. Ill. Nov. 18, 2022)

("While Plaintiffs allege that [nasal swab COVID testing] conflicts with their religious

beliefs, they do not indicate the nature of the conflict, failing to identify any religious

tenet which is offended by this testing.") *rev'd and remanded on other grounds*, 71 F.4th

622 (7th Cir. 2023); *see also Egelkrout v. Aspirus, Inc.*, No. 22-118, 2022 WL 2833961, at *3

(W.D. Wis. July 20, 2022) (denying Title VII claim as to mandatory COVID-19 testing where

plaintiff did not identify "genuinely held religious beliefs" which were in conflict with the

testing requirement).  Rubin's prayer to God alone does not rise to the level of protected

religious belief.  *See Passarella*, 2023 WL 2455681, at *6 (dismissing claims where

plaintiffs refused the vaccine, "claiming that their decisions had been ratified by prayer,"

because "the use of religious vocabulary does not elevate a personal medical judgment to a matter of protected religion").

Moreover, Rubin alleges that she does not believe in "allowing testing of her body **when it is not necessary**." (Rubin Compl. ¶ 34 (emphasis added).) She does not allege how her religion dictates weekly COVID-19 testing is "unnecessary." In fact, this language suggests that her religious beliefs are not inherently in conflict with weekly testing, but rather she has made a personal judgment about the necessity of COVID-19 testing. Rubin also never explicitly states that weekly testing violates her religion—simply that it "violates her conscience." (*Id.* ¶¶ 11, 34.) Because Rubin has failed to plausibly allege that she has a sincerely held religious belief that is in conflict with the Policy's weekly testing requirement for unvaccinated employees, the Court will dismiss her Title VII claim.

## III.    MINNESOTA HUMAN RIGHTS ACT CLAIMS

Similar to Title VII, the MHRA makes it unlawful for an employer to "discharge an employee" or "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of an employee's religion or national origin. Minn. Stat. § 363A.08, subd. 2. The Court analyzes an employer's liability for discrimination under both Title VII and the MHRA using the same legal standards. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc); *Bahr v. Cappella Univ.,* 788 N.W.2d 76, 83 (Minn. 2010).

The MHRA provides that it is unlawful for an employer to "discharge an employee" on the basis of religion. Minn. Stat. § 363A.08, subd. 2. The MHRA does not, however,

explicitly provide that it is unlawful for an employer to fail to accommodate religious beliefs.  Furthermore, although the MHRA does provide a Reasonable Accommodation provision, it only applies to disability discrimination, not religious discrimination.  *See* Minn. Stat. § 363A.08, subd. 6.

The District of Minnesota recently held that failure to accommodate religious beliefs is not a cognizable claim under the MHRA.  *See Balow v. Olmsted Medical Ctr.*, No. 22-1668, 2023 WL 2776028, at *4 (D. Minn. Apr. 4, 2023) ("The lack of an express duty under the MHRA to provide for religious accommodations is additionally notable because the statute makes clear that discrimination and failure to accommodate are two separate and distinct unlawful employment practices.").  Although Plaintiffs argue the *Olmsted* court erred in its application of *Benjamin v. Cnty. of Hennepin*, No. C8-96-1122, 1996 WL 679690 (Minn. Ct. App. Nov. 26, 1996), *Benjamin* is an unpublished Minnesota Court of Appeals decision that did not cite to any language in the MHRA or any cases under Minnesota law for its proposition.  *Benjamin* is unpersuasive here.

While Title VII expressly confers a duty to provide reasonable accommodations, the MHRA does not.  Plaintiffs' MHRA failure to accommodate claims are therefore not cognizable and will be dismissed accordingly.

IV.     **AMERICANS WITH DISABILITIES ACT CLAIMS**

   **A. Exhaustion**

   Plaintiffs' claims under the ADA must also be exhausted by filing a charge with the EEOC and receiving notice of the right to sue.  *See Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 919–20 (2018).  The Court must dismiss ADA claims that were not properly exhausted.  *Id.* at 921 (affirming dismissal of federal ADA and ADEA claims for failure to exhaust administrative remedies).  Employees should present each claim that they plan to pursue first to the EEOC.  *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944 (8th Cir. 2021).  The Eighth Circuit has repeatedly dismissed claims due to lack of exhaustion where a box was not checked or where a particular type of discrimination was not mentioned in the charge.  *E.g., id.* at 945; *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 539 (8th Cir. 2020).  The District of Minnesota has also explicitly stated that "a claim of disability discrimination could not be reasonably expected to follow from the scope of [an] EEOC charge describing only religious discrimination."  *Goecke v. 3M Co.*, No. 22-3087, 2023 WL 3309784, at *1 (D. Minn. Apr. 20, 2023).

   Plaintiffs Kiel, Miller, and Ringhofer all filed charges with the EEOC, but none of them mentioned the ADA or disability in their charges.  (*See* Kiel Agency Filings; Miller Agency Filings; Ringhofer Agency Filings.)  Miller's and Ringhofer's charges both indicated they believed they were discriminated against based on their age in violation of the Age Discrimination in Employment Act.  (Miller Agency Filings at 7; Ringhofer Agency Filings at 5.)  However, age is not related to the ADA claims set forth in their complaints, which

stem from the ADA's medical examination provisions and "the discrimination between the vaccinated and unvaccinated." (Miller Compl. ¶¶ 103–104; Ringhofer Compl. ¶¶ 101–102.) All three also claimed religious discrimination, which is not sufficiently related to ADA disability claims to consider those exhausted. The Court will therefore dismiss Kiel, Miller, and Ringhofer's ADA claims for failure to exhaust.

### B. Failure to State a Claim

Ihde and Rubin both base their ADA claims on the ADA's prohibition on medical examinations and disability inquiries. They assert that the weekly testing requirement violated the ADA's medical examinations and inquiries provisions, 42 U.S.C. § 12112(d)(4)(A). (Rubin Compl. ¶ 94; Ihde Compl. ¶ 110.) They allege that the weekly testing requirement was "neither job related nor consistent with business necessity," and that it discriminated against the unvaccinated because both vaccinated and unvaccinated individuals can be infected and transmit COVID-19. (*Id.*)

The ADA prohibits an employer from requiring a medical examination or inquiring about an employee's disability status "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The Eighth Circuit has explained that this provision applies to all employees, regardless of whether they have a disability. *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). A "medical examination" is "a procedure or test that seeks information about an individual's physical or mental impairments or health." *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 574 (6th Cir. 2014). A disability inquiry is "a question (or series of questions) that

is likely to elicit information about a disability." *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA*, EEOC (Jul. 27, 2000), *available at* https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#4.    The employer bears the burden of establishing business necessity under 42 U.S.C. § 12112(d)(4)(A). *Thomas*, 483 F.3d at 527.

Plaintiffs summarily assert that they have pled a violation of the ADA's prohibition of medical examinations and inquiries.  However, federal courts—including the District of Minnesota—have consistently held that subjecting employees to COVID-19 testing "does not amount to an unlawful medical examination" under the ADA. *E.g., Kehren v. Olmsted Med. Ctr.*, No. 22-1560, 2023 WL 2776094, at *6 (D. Minn. Apr. 4, 2023).[2]

Ihde's and Rubin's disability discrimination claims also fail.  The ADA prohibits a covered employer from discriminating against any qualified individual on the basis of disability.  42 U.S.C. § 12112(a).  To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that they (1) have a "disability" within the meaning of the ADA, (2) are qualified under the ADA, and (3) suffered an adverse employment

---

[2] *See also McCone v. Exela Techs., Inc.*, No. 6:21-912, 2022 WL 801772, at *4 (M.D. Fla. Jan. 14, 2022) ("[B]eing infected with COVID-19, standing alone, does not meet the ADA's definitions of disability or impairment.  Therefore, a COVID-19 test is not 'likely to reveal a disability.'"); *Sharikov v. Philips Med. Sys. MR, Inc.*, No. 22-326, 2023 WL 2390360, at *15 (N.D.N.Y. Mar. 7, 2023) (collecting cases).

action as a result of the disability.  *Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 370 (8th Cir. 2018).

The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S.C. § 12102(1).  To establish that a condition is substantially limiting, the plaintiff must demonstrate that they are "significantly restricted as to the condition, manner or duration under which [they] can perform a particular major life activity, as compared to the average person."  *Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 903 (8th Cir. 2010) (citing 29 C.F.R. § 1630.2(j)(1)(ii)) (internal quotations omitted).

Plaintiffs here have not shown that their unvaccinated status "substantially limits" their major life activities.  In fact, there is nothing in their amended complaints that pertains to any of their health concerns.  Because they have not shown they are disabled, Ihde and Rubin failed to state a claim to relief for disability discrimination.

Likewise, any claims under the ADA's failure to accommodate provision fail.  The ADA's prohibition of discrimination on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016).  To successfully bring an ADA failure to accommodate claim, a plaintiff "must first produce evidence that [they have] a disability within the meaning of the ADA."  *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 410 (8th Cir.

2018) (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 713 (8th Cir. 2003)).

Ihde and Rubin have not alleged a disability, so they have not stated a claim to relief for

failure to accommodate.  Ihde's and Rubin's ADA claims will therefore be dismissed.

## V.    CONTRACTUAL CLAIMS

Plaintiffs bring two contractual claims: breach of contract and promissory

estoppel.  They allege that Mayo had "a policy of honoring diversity, equity and inclusion,

including the protection of the religious rights of its employees." (Kiel. Compl. ¶ 104; Ihde

Compl. ¶ 113; Miller Compl. ¶ 107; Ringhofer Compl. ¶ 105; Rubin Compl. ¶ 97.)  Mayo's

equal opportunity policy allegedly states that it "is committed to upholding laws

prohibiting discrimination and/or harassment on the basis of . . . religion." (Kiel. Compl.

¶ 105; Ihde Compl. ¶ 114; Miller Compl. ¶ 108; Ringhofer Compl. ¶ 106; Rubin Compl. ¶

98.)  Plaintiffs allege that these statements created a contract between Mayo and its

employees, which Mayo then breached by terminating Plaintiffs based on their religious

beliefs.  (Kiel. Compl. ¶¶ 106–07; Ihde Compl. ¶¶ 115–16; Miller Compl. ¶¶ 109–10;

Ringhofer Compl. ¶¶ 107–08; Rubin Compl. ¶¶ 99–100.)

### A.  Breach of Contract

The parties do not seem to dispute that Mayo's equal opportunity policy, if it in

fact constitutes a contract, would be a unilateral contract.  Under Minnesota law, a

unilateral contract requires (1) an offer definite in form; (2) communication of the offer;

(3) acceptance; and (4) consideration.  *Neb. Beef, Ltd. v. Wells Fargo Bus. Credit, Inc.*, 470

F.3d 1249, 1251 (8ᵗʰ Cir. 2006) (citing *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 742 (Minn. 2000)). "An offer must contain sufficiently definite terms to enable the fact-finder to interpret and apply them." *Id.* The determination of whether an offer is sufficiently definite "is an objective consideration determined by the outward manifestations of the parties." *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn. 1983)).

Plaintiffs have failed to allege that Mayo's equal opportunity policy creates a unilateral employment contract in part because they have not alleged that it is sufficiently definite. The equal opportunity policy does not include any key employment terms like compensation or benefits. The Minnesota Supreme Court in *Pine River* explained that "a promise of employment **on particular terms** of unspecified duration" may create a binding unilateral contract if accepted. *Id.* However, "[a]n employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer." *Id.*

The Minnesota Supreme Court has considered whether employee handbooks constitute a unilateral contract several times. In *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520 (1972), a "control copy" of the employer's personnel policies contained a provision that employees would not be dismissed without good cause. The court held that this did not constitute a contractual offer because it did not appear in the manuals given to employees. In *Degen v. Investors Diversified Servs., Inc.*, 260 Minn. 424 (1961),

the court held that an employer's personnel policy providing for a preliminary discussion between an employee and their supervisor before dismissal did not create a contract. The Minnesota Supreme Court distinguished *Cederstrand* and *Degen* in *Pine River*, finding that procedural restraints on termination of employees contained in the employee handbook were contractually binding. *Pine River*, 333 N.W.2d at 626 n.4. Though the employee handbook's general provision called "Job Security" did not constitute a unilateral offer because it was "no more than a general statement of policy," the handbook's provisions that set out definite procedures to be followed in job termination did create an offer. *Id.* at 630.

Here, Mayo's equal opportunity policy is not sufficiently definite to constitute a unilateral offer. Plaintiffs merely allege that Mayo said it "is committed to upholding laws prohibiting discrimination . . . on the basis of religion." (Kiel. Compl. ¶ 105; Ihde Compl. ¶ 114; Miller Compl. ¶ 108; Ringhofer Compl. ¶ 106; Rubin Compl. ¶ 98.) This does not set forth any detailed procedures. It is merely a policy statement, dissimilar to the employee handbook in *Pine River*. Because Plaintiffs have not alleged Mayo communicated a definite offer, Plaintiffs failed to plausibly allege breach of contract.

### B.  Promissory Estoppel

In the alternative, Plaintiffs urge the Court to find that Mayo's "promises to its employees, both written and verbal, created an expectation on which the employees . . . relied to [their] detriment." (Kiel. Compl. ¶ 109; Ihde Compl. ¶ 118; Miller Compl. ¶ 112; Ringhofer Compl. ¶ 110; Rubin Compl. ¶ 102.) "Promissory estoppel is an equitable

doctrine that implies a contract in law where none exists in fact." *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). To successfully bring a promissory estoppel claim, a plaintiff must show (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice. *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 152 (Minn. 2001).

Plaintiffs have not stated a claim to relief premised on promissory estoppel because, like the breach of contract claim, the statements in Mayo's equal opportunity policy are not sufficiently definite. Moreover, Plaintiffs have not alleged any facts that show they relied on Mayo's statement to their detriment. Their promissory estoppel claim is a formulaic recitation of the elements, insufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. Plaintiffs' promissory estoppel claims will therefore be dismissed.

## CONCLUSION

Because they failed to exhaust their administrative remedies and their claims are now time-barred, the Court will dismiss Ihde's Title VII claim, Miller's Title VII claim, Kiel's ADA claim, Miller's ADA claim, and Ringhofer's ADA claim. The Court will also dismiss Ihde and Rubin's ADA claims because COVID-19 tests do not qualify as an unlawful medical examination, and they did not plausibly allege a disability. Failure to accommodate claims are not cognizable under the MHRA, so the Court will also dismiss Plaintiffs' MHRA claims.

Because Mayo's equal opportunity policy is not sufficiently definite to form a contract and Plaintiffs have not alleged that they relied on it to their detriment, the Court will dismiss Plaintiffs' breach of contract and promissory estoppel claims. Lastly, the Court will dismiss Kiel, Ringhofer, and Rubin's Title VII claims because they all failed to adequately plead that their protected, sincerely held religious belief was the basis for their opposition to the COVID-19 vaccine.[3]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss [No. 22-1319, Docket No. 42; No. 22-1327, Docket No. 35; No. 22-1405, Docket No. 36; No. 22-1420, Docket No. 31; No. 22-1427, Docket No. 29] are **GRANTED** and these cases are **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 4, 2023
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

---

[3] Because the Court will dismiss Plaintiffs' Title VII and ADA claims, it need not consider whether it should strike Plaintiffs' request for punitive damages for those claims.